James O. Moore, J.
The institution of this action marks the fourth attempt to seek judicial intervention, through the medium of taxpayers’ actions, in the long and tortuous public controversy that has surrounded legislative action respecting the construction by the County of Erie of domed stadium facilities. The first three actions all sought, on one ground or another, to enjoin the County Executive and the County Legislature from entering into a long-term lease or in the alternative a management contract with Kenford Company, Inc. and its wholly owned subsidiary, Dome Stadium, Inc. The complaints in all of these actions have been dismissed, and the facts and circumstances surrounding this dispute as well as the action taken by the Legislature of the County of Erie and the County Executive up through August 8, 1969 are set forth in some detail in opinions of the appellate courts (Hurd v. Erie County, 34 A D 2d 289 [4th Dept.]; Murphy v. Erie County, 34 A D 2d 295 [4th Dept.], affd. 28 N Y 2d 80).
In sharp contradistinction to the relief sought in the first three taxpayers’ actions, the complaint in the instant case seeks to compel the county, the County Executive (B. John Tutuska), and the County Legislature to take all action necessary to implement the contract of August 8,1969 between the county, Kenford and Dome and to enjoin such defendants from pursuing any course of action not compatible with the performance of the contract.
The prayer for relief also demands judgment nullifying a resolution of the County Legislature on January 19, 1971 which purported to terminate the relationship between the county, Kenford and Dome without any legal liability on the part of the county, and requiring the defendants Ludera and Pordum to account to the county for gains received by them as a consequence of their misuse of their official positions as County Legislators and also to account for the substantial losses suffered by the county as a result of their actions. In short, the previous actions sought to restrain the county from entering into contracts and incurring indebtedness in connection with the building of a domed stadium, while the present action, in essence, seeks specific performance of a contract to construct this multi *576 million dollar facility and to execute with Kenford and Dome a contract to manage it for 20 years.
The complaint is founded on section 51 of the General Municipal Law and names as defendants the county, the County Legislature, and the County Executive (Tutuska). In addition, Frank Ludera, described as a legislative representative of the Third Legislative District of the County of Erie as well as the Democratic minority leader of the Legislature, and Frederick F. Pordum, described as the legislative representative of the First Legislative District, are named defendants, as are John Doe, Richard Doe, X Corporation and Y Corporation. The latter are unidentified but described as individuals and business entities unknown to the plaintiffs who participated in an unlawful conspiracy to block construction of the domed stadium, to preclude the county’s performance of its contract, and to cause the county to construct some other stadium facility, or in the alternative, to prevent the construction of any stadium facility with the intent and purpose of enhancing their political and financial interests.
There follows a recital of the events which took place up through August 8, 1969 culminating in the execution of the contract between the county and Kenford and Dome. The complaint goes on to allege that on February 17, 1970, after the receipt of preliminary plans, specifications, and cost estimates, negotiations were commenced with respect to a 40-year lease agreement between the county and Kenford and Dome, Inc. as contemplated in the contract of August 8, 1969. No agreement was reached with respect to the terms of the lease within the three-month lease negotiations period specified in the contract, and it is alleged that at this time the county became obligated to execute and proceed under the management contract annexed to the contract of August 8, 1969. Although Dome executed and delivered the management contract to the County Executive, he in turn refused to execute the contract.
It is the gravamen of the complaint that the County Executive has caused the county to breach the contract of August 8, 1969 and is engaged in a course of conduct to achieve a violation of said contract and to preclude the construction of the domed stadium. Nonetheless, it appears from the complaint that the negotiations between the parties continued subsequent to the expiration of the three-month deadline and on July 25, 1970 the County Executive recommended to the County Legislature a lease agreement containing terms more favorable to the county, which Dome was prepared to accept, and the so-called 1 ‘ Tutuska *577 Lease ’ ’ was thereupon submitted for the approval of the County Legislature.
The complaint alleges that at this juncture defendants Ludera and Pordum, as well as other unidentified legislators and county officials, engaged in a course of conduct to misrepresent to the Legislature the terms of the lease and to cause other members of the Legislature to vote against it. It is claimed that, as a consequence of their illegal activities and the conspiracy in which they were engaged, 11 Legislators on January 18, 1971 adopted a resolution purportedly terminating the county’s obligation under the contract of August 8,1969. The disputed resolution recites that bids received on the cost of the project exceeded the 50 million dollar bond resolution adopted in May, 1968, by more than 23 million dollars, and that without substantial changes in lease provisions relating to cash rent and performance guarantee, it appeared that the 11 votes required for lease approval and the 14 votes required for increasing the project cost will not be forthcoming. In light of these recited circumstances the Legislature resolved that the county’s participation in the Lancaster Dome Stadium project be terminated and an amended resolution purported to end the relationship between the county, Kenford and Dome, Inc. without any legal liability on the part of the county.
The complaint charges that this resolution, adopted as a consequence of the fraud, collusion and malfeasance of the defendants Ludera and Pordum and other persons unknown to the plaintiffs, is an illegal, unilateral action which has no legal effect on the existing, continuing obligations of the county under the contract of August 8, 1969.
It is further alleged that unless the County Legislature and the County Executive are required by order of this court to perform the contract of August 8, 1969 and to proceed with the construction of the domed stadium facilities as required therein, the plaintiffs and all other taxpayers of the county will be irreparably harmed and damaged.
The prospective waste detailed in the complaint consists among other things of the following: loss of new business consisting of expenditures by millions of visitors, hundreds of millions of dollars of new private development construction, thousands of new permanent jobs, hundreds of millions of dollars of tax revenues, 7 to 10 million dollars in value by failing to take advantage of the offer of the construction industry to reduce costs on the stadium, the substantial value of the county’s bargain, risk of loss of damages for breach of the contract, the *578 waste of 3 million dollars for preliminary expenditures, possible loss of the existing National Football League franchise, the loss of opportunity of obtaining a National League baseball franchise, and the subjecting of the county to “ nationwide and international ridicule and scorn for dishonoring its contractual obligations.”
The defendants have moved to dismiss the complaint pursuant to CPLR 3211 (subd. [a]) on the ground, among others, that the complaint fails to state a cause of action. This is the traditional “non-speaking motion” and the court must assume for the purposes of the motion that the facts alleged in the complaint are true. The same assumption, however, does not apply to conclusory allegations, speculative assertions or bare charges of fraud.
At common law in this State, a taxpayer had no standing to invoke the equity jurisdiction of the courts against public officials for the purpose of vindicating public as opposed to private rights against the waste of public funds. (Doolittle v. Supervisors of Broome County, 18 N. Y. 155.) Moreover, it was held that the Attorney-General acting for and on behalf of the State, had no authority to institute an action against the officials of municipal corporations to recover the proceeds of bonds which had been unlawfully diverted by public officials for their own use. (People v. Ingersoll, 58 N. Y. 1.) Following the revelations of the fraud and corruption practiced by the Tweed Ring in New York City, the Legislature moved to fill this gap. In 1872 it adopted the first in a series of statutes designed and intended to afford standing to taxpayers seeking to protect public rights against the corrupt and illegal acts of public officials which threatened the waste of public funds. This legislation is presently embodied in section 51 of the General Municipal Law and the instant action is based on that statute.
Thus, the primary purpose and effect of section 51 was to afford standing to a taxpayer to invoke the general equitable powers of the court. Since it is a remedial statute it has properly been liberally construed but it must be administered and applied in accordance with traditional equitable concepts. (Southern Leasing Co. v. Ludwig, 217 N. Y. 100.)
The equitable jurisdiction conferred by section 51 of the General Municipal Law is preventive in nature. It is available only upon a showing of threatened action on the part of public officials which is illegal in the sense that it is fraudulent or beyond or in excess of the scope of their power. Allegations of mere illegality do not, however, suffice. In addition, a fair reading of the com *579 plaint must affirm a reasonable relationship between the illegality charged and a detriment to the municipality through the factual waste of its funds or the threat of injury so irreparable and imminent as to warrant the granting of an injunction in accordance with traditional equitable standards. (Western N. Y. Water Co. v. City of Buffalo, 242 N. Y. 202; Campbell v. City of New York, 244 N. Y. 317; Kaskel v. Impellitteri, 306 N. Y. 73; Gaynor v. Rockefeller, 15 N Y 2d 120.)
Judged in the light of these standards, the complaint in the case at bar fails to state a cause of action. Stripped of excess verbiage and irrelevant allegations, the illegality charged is that the County Executive has breached the contract executed by the county and Kenford and Dome on August 8, 1969 by refusing to execute the management contract which is attached thereto, and has acted to cause the county to breach and violate the aforesaid contract. It is further charged that the county, by adopting the resolution of January 19, 1971 unilaterally terminating the relationship between the county and Kenford and Dome, violated the laws and the Constitution of the State of New York and the Constitution of the United States, and that such resolution had no legal effect on the existing and continuing obligations of the county under the contract of August 8, 1969.
Thus, the illegality consists of a claimed breach of contract and the adoption of a void resolution. One of the circumstances that gave rise to this turn of events appears in the resolution of January 19, 1971, which is attached to the complaint. The recitals of such resolution disclose that the original bond resolution of May, 1968 which preceded the negotiations of the Kenford-Dome contract was limited to 50 million dollars, and that the bids which had been received for the construction of the facility in February, 1970 exceeded this limitation by 23 million dollars. The resolution goes on to recite that in light of this circumstance, the 11 votes required for lease approval and the 14 votes required for increasing the project costs would not be forthcoming.
The Court of Appeals in its opinion affirming the dismissal of the complaint in Murphy v. Erie County (28 N Y 2d 80, 86, supra) had occasion'to comment on this aspect of the litigation. It was there argued that the appeal should be dismissed because the matter had become moot by reason of the differential between the bond authorization and the construction costs. The court said (p. 86): “ The fact that the bids submitted exceeded the amount authorized by the county does not render the litigation moot. Whether the county is absolved from any obligation to *580 Kenford and whether its legislature was justified in rescinding the contract by unilateral action are questions which require a factual determination as to the intention of the parties.”
It follows, therefore, that the resolution of the legality of the position taken by the County Executive and the County Legislature involves, at the very least, the determination of complex questions of fact involving the intent of the parties to the agreement of August 8, 1969. Moreover, it is readily apparent that the Court of Appeals on the record in the Murphy case (supra) did not undertake to delineate the other issues that might arise in an action between the parties to the contract. Under these circumstances there is no want of power in the County Executive and the County Legislature to refuse to execute the management contract and thus present the legal questions respecting the rights and duties of the parties. Indeed, it could well be argued that it was their duty to adopt such a course, faced as they were with a bond resolution that failed to meet construction costs by some 20 millions of dollars. Certainly the execution of the management contract, committing public funds far in excess of the amount provided by the Legislature, cannot be deemed a mere ministerial act, as the plaintiffs would have it.
The claimed illegality is dramatized and colored by allegations that the defendants, Ludera and Pordum, together with certain unidentified public officials and other legislators misrepresented the terms of the so-called Tutuska lease, and that the resolution of January 19, 1971 terminating the relationship between the county and Kenford and Dome was adopted as a consequence of their ‘ ‘ fraud, collusion and malfeasance in office ’ ’ pursuant to ‘1 their alleged activities and conspiracies. ’ ’ It is also alleged that the defendants named (but presumably not served) as John Doe, Bichard Doe, X Corporation and Y Corporation participated in a conspiracy to block construction of the Dome Stadium “ with the intent and purpose of gratifying and enhancing political and financial interests. ’ ’
The court takes judicial notice of the circumstances that, subsequent to the service of the complaint and the argument of this motion, Ludera and Pordum were convicted in the United States District Court for the Western District of New York of the crime of conspiracy to commit bribery through the use of facilities in interstate commerce.
Nonetheless those allegations add nothing to the claim of illegality charged against the County Executive and the County Legislature. In the first place there is no charge of malfeasance upon the part of the County Executive or the County Legislature as a body. Secondly, the challenged pleading must stand *581 on its own. Despite the liberalization of pleading effected by the Civil Practice Law and Rules, subdivision (b) of CPLR 3016 requires that claims based upon fraud must state in detail the circumstances constituting the wrong alleged. Bald conclusory statements of misrepresentation, conspiracy, collusion and malfeasance lend no substance to a pleading. (Knowles v. City of New York, 176 N. Y. 430; Hirn v. Harris, 30 A D 2d 951 [1st Dept.].) Finally, it is firmly established that the motives of individual lawmakers inducing legislative action are not subject to judicial injuiry in an action or proceeding involving the validity or application of such legislation. (Kittinger v. Buffalo Traction Co., 160 N. Y. 377; Blanshard v. City of New York, 262 N. Y. 5; Burack v. Town of Poughkeepsie, 32 A D 2d 806 [2d Dept.].) In People ex rel. Wood v. Draper (15 N. Y. 532, 545) the court said: ‘ ‘ There is room for much bad legislation and misgovernment within the pale of the constitution; but whenever this happens, the remedy which the constitution provides, by the opportunity for frequent renewals of the legislative bodies, is far more efficacious than any which can be afforded by the judiciary. The courts cannot impute to the legislature any other than public motives for their acts. If a given act of legislation is not forbidden by express words, or by necessary implication, the judges cannot listen to a suggestion that the professed motives for passing it are not the real ones.”
Further sanctions are available against legislators who have betrayed the public trust, as evidenced by the recent prosecutions involving the defendants Ludera and Pordum.
The present posture of the contractual relationship between the county, Kenford and Dome cannot be determined in a taxpayers’ action wherein Kenford and Dome are not even parties. It must of necessity be left to a suit for breach of contract, which the complaint indicates is imminent since a notice of claim for 90 million dollars has been filed against the county. Under these circumstances the enforcement of the contract must be undertaken by those who are parties to it. (Lowe v. Town of Mount Pleasant, 240 App. Div. 997 [2d Dept.].)
The second essential element to the maintenance of a taxpayers’ action pursuant to section 51 of the General Municipal Law is the showing of a reasonable causal relationship between the illegal action and the ensuing factual waste of public funds, or irreparable damage to the public interest so imminent as to warrant the granting of the relief sought upon traditional equitable principles. The complaint sets forth eight categories of claimed public waste. Six of these are of such a conclusory and speculative nature as to merit little, if any, discussion. For *582 example, it is alleged that the county will be subject “ to nationwide and international ridiclule and scorn. ” The argumentative nature of this type of ‘ ‘ public waste ’ ’ is readily apparent. The threatened loss of the National Football League franchise, the loss of opportunity of obtaining a major league baseball franchise, the loss of the substantial value of the county’s bargain, the loss of new business and jobs, and the loss of the construction industry’s offer to reduce costs in building the dome stadium in Lancaster only, all are subject to the same objection in that there is lacking reasonable causal relationship stemming from the claimed illegality.
It is further alleged that the county will have wasted some 3 million dollars in money already expended in furtherance of the domed stadium project and will be subject to the risk of loss of damages for breach of the contract of August 8, 1969. These last two items do bear some causal relationship to the claimed illegality and more properly fall into the traditional category of public waste. On the other hand, under the circumstances of this case, wherein the illegality is dependent upon the resolution of complex factual issues, allegations of public waste do not afford standing to maintain the action. Moreover, even if illegality should be conceded, the type of relief sought in the complaint, to wit, specific performance of a multi-million dollar project and a 20-year management contract lies beyond the scope of equitable relief afforded by section 51 of the General Municipal Law.
In Southern Leasing Co. v. Ludwig (217 N. Y. 100, supra), Judge Cardozo recognized the difference between the preventive equity jurisdiction made available to a taxpayer under the General Municipal Law and the mandatory type of relief available under article 78 in a proceeding in the nature of the prerogative writ of mandamus. The court made clear that the type of relief sought in this action could be granted only in an article 78 proceeding. The plaintiff contends, in the alternative, that the public interest in this matter is so great that the court is warranted in treating this action as a proceeding under article 78 and issuing an order mandating the relief sought in the complaint.
Applying to the complaint the standards applicable to a petition in mandamus, it still fails to state a claim upon which that form of relief can be granted. It is fundamental that an order of mandamus will lie only for the enforcement of a clear legal right. (Matter of Marburg v. Cole, 286 N. Y. 202; Matter of Buffalo Dump Truck Owners Assn. v. Condon, 232 App. Div. 273 [4th Dept.].) As noted above the legal right in question is anything but clear and we come full circle to the point of beginning *583 that the complaint fails to state a wrongful, illegal act upon the part of public officials. The rationale of this requirement as a predicate for taxpayers’ actions as well as the issuance of preemptory writs is found in the circumstance that factual situations involving questionable legal rights and duties are more properly resolved in plenary actions between the interested parties.
In summary the facts alleged in the complaint fail to meet the standards governing the exercise of equitable jurisdiction in taxpayers’ actions. The illegal act is not so clear nor is the danger so imminent and irreparable as to warrant the granting of specific performance, the most drastic and therefore most zealously guarded form of equitable relief.
The motion to dismiss the complaint is granted. Since it is the opinion of this court that the complex of facts constituting this controversy cannot sustain g legally sufficient complaint in a taxpayers’ action, leave to amend the complaint is denied. (Sardo v. County of Dutchess, 53 Misc 2d 603, affd. 27 A D 2d 989, affd. 20 N Y 2d 692.)