Bertram Harnett, J.
The right of the public to know of governmental operations and to inspect public records is funda *281 mental to the workings of a democratic society. Is this any less so because the particular person seeking to inspect is a candidate for public office in an upcoming election? That is the focal question here.
A. The Taxpayer-Candidate and the Records He Seeks to Inspect.
Richard G. Winston is a taxpayer resident of the Village Great Neck Park District, author of a column dealing with parks and recreation in a weekly Great Neck newspaper, and a candidate for election to the Board of Commissioners of the Great Neck Park District to be held on December 12, 1972. He wishes to inspect a number of documents kept on file by the present Board of Commissioners, in presumably significant part for the purpose of electoral persuasion.
From a broad list of many items sought by Dr. Winston, the board, on oral argument of this proceeding, has voluntarily agreed to furnish many, but has nonetheless balked on disclosing three records: (1) the results of an independent laboratory study made in October and November 1972 at the request of the board to test the construction of the roof of a recently constructed Parkwood ice skating rink; (2) the list of employees of the Great Neck Park District, along with their addresses and pay scales; and (3) the salary, expense and time vouchers submitted by each Commissioner.
B. The Citizen’s Right to Know.
Governmental openness to public scrutiny is a key to accountability for official conduct. It is only the informed electorate which can timely discharge the democratic mandate. Moreover, complete public candor is a safeguard against improper procedures, corruption and mismanagement, and is a principal check on the integrity of public office.
The New York State Legislature has expressly recognized the value of .such openness in section 51 of the General Municipal Law which gives any taxpayer the right to sue public officials for “ any illegal act ”, “to prevent waste or injury to, or to restore and make good, any [public] property, [or] funds ”, and, in the following language, vests each taxpayer with a broad right to inspect public records: “ All books of minutes, entry or account, and the books, bills, vouchers, checks, contracts or other papers connected with or used or filed in the office of, or with any officer, board or commission acting for or on behalf of any county, town * * * or other unit of local government in this state * * * are hereby declared to be public records, *282 and shall he open, subject to reasonable regulations to be prescribed by the officer having the custody thereof, to the inspection of any taxpayer ”.
The taxpayer’s right to sue government officials to vindicate public as .opposed to private rights, and thé concomitant right to inspect did not exist at common law. However, there is the statute, and it gives the court broad remedial jurisdiction which is to be construed liberally for the protection of the taxpayers. (Holton v. Board of Supervisors of County of Monroe, 245 App. Div. 144, 145; Hansen v. Ludera, 67 Misc 2d 574, 578; Matter of C. Van Deusen, Inc. v. New York State Liq. Auth., 47 Misc 2d 1094, 1096.)
Without the right to see records and documents kept by public officials, Or the right to be present at proceedings, the citizen might seldom know of improprieties so as to be in a position to seek judicial remedies for illegal acts by public officials and the public might only know what the government wants it to know. That essentially “ Orwell-ian ” insulation of public bodies is not the law in New York.
In a parallel provision, section 66 of the Public Officers Law provides: “ A person, having the custody of the records or other papers in a public office, within the state, must, upon request, and upon payment of, or offer to pay, the fees allowed by law, or, if no fees are expressly allowed by law, fees at the rate allowed to a county clerk for a similar service, diligently search the files, papers, records, and dockets in his office; and either make one or more transcripts therefrom, and certify to the correctness thereof, and to the search, or certify that a document or paper, of which the custody legally belongs to him, can not be found ”.
It is interesting to note that the statutes do not require a showing of cause for inspection of public records, nor is there any special limitation placed on candidates for public office. Were the candidate or newspaper colmunist denied this right solely because of his activities peculiarly vested with wide public exposure, serious constitutional questions would be raised regarding abridgement of freedoms of the press and speech. (See New York Times Co. v. United States, 403 U. S. 713 [1971].)
We begin therefore with the general proposition that all documents classified as public records are open for public inspection and that, absent a contrary statute or rule, the public policy of New York favors making all records and papers kept in a public office available for inspection. (Matter of Werfel v. Fitzgerald, 23 A D 2d 306, 309; Matter of New York Post Corp. v. *283 Moses, 12 A D 2d 243, 251, revd. on other grounds 10 N Y 2d 199.)
C. What is a Public Record?
Neither the General Municipal Law nor the Public Officers Law defines a ‘ public record ”, although it must necessarily include “ all books of minutes, entry or account, and the boohs, bills, vouchers, checks, contracts or other papers connected with or used or filed in the office of, or with any officer, board or commission acting for or on behalf of any county, town * * * or other unit of local government in this state ’ (General Municipal Law, § 51; emphasis supplied.) For State archive purposes, any “ book, paper, map * * or other information storage device” belonging to a town or village is a ‘ ‘ public record ”. (Education Law, § 144.)
These are very broad standards, and the cases reflect some of the real outside parameters. Engineering records kept by a municipality have been held to be public records subject to inspection (Matter of Ihrig v. Williams, 181 App. Div. 865), as have records of receipt of moneys paid to a mayor (Matter of Becker v. Lunn, 200 App. Div. 178). Data cards used to reappraise real property (Matter of Sanchez v. Papontas, 32 A D 2d 948); school purchase records (Matter of Welt v. Bvard of Educ. of Union Free School Dist. No. 3, 68 Misc 2d 1061); employment records of municipal firemen (1964 Atty. Gen. [Inf. Opns.] 89); and warrants presented for payment (23 Opns. St. Comp., 1967, p. 659) have also been held to be public records.
On the other hand, public authority records (Matter of New York Post Corp. v. Moses, 10 N Y 2d 199); urban renewal correspondence (Matter of Sorley v. Clerk, Mayor and Bd. of Trustees of Inc. Vil. of Rockville Centre, 30 A D 2d 822; see Matter of Sorley v. Lister, 33 Misc 2d 471); pre-parole records (Matter of Jordan v. Loos, 204 Misc. 814, affd. 283 App. Div. 983); and public welfare records (Matter of Coopersberg v. Taylor, 148 Misc. 824), have been held not to be public records subject to inspection. As a general rule, matters deemed confidential are not divulged.
There is no doubt, and the parties do not dispute, that the Board of Commissioners of Great Neck Park District is a governmental unit operating a public office, subject to the statutory inspection requirements. (See Town Law, §§ 190, 198.)
In all, the nature and purpose of each document on file with the park district should be examined to determine its “ public ” nature and the propriety of rendering it subject to citizen *284 scrutiny. (People ex. rel. Stenstrom, v. Harnett, 131 Misc. 75, affd. 224 App. Div. 127, affd. 249 N. Y. 606; cf. Matter of Looby v. Lomenzo, 60 Misc 2d 16.) The value cf public disclosure must be weighed in terms of the benefits accruing to an informed citizenry against the dangers of airing confidential or privileged information. Bight to know does not carry with it the right to harass, or to disrupt public operations unreasonably. Accordingly, public disclosure is subject to “ reasonable regulation” by the appropriate public officials (20 Opns. St. Comp., 1964, p. 507), which, in turn, depends upon the mutual good faith of all parties concerned and the particular facts involved.
D. The Great Neck Parks Records.
What can be .said, then, cf the public nature of the records sought by Dr. Winston?
1. Rink Rooe Laboratory Study.
a. Public Record.
This report was ordered by the board at a public hearing held on January 27, 1972, as spread on the minutes, at a maximum cost of $400 paid cut cf public moneys. It purports to be a scientific analysis designed to furnish information as to the quality of the rcof and was suggested, according to the minutes, by the architect who had been called in to advise on reported roof leakage in the structure. The board minutes do not indicate what use was to be made cf the study, nor that it was for any reason deemed secret or confidential.
Undoubtedly, the public interest in the results of this study is high for the skating rink entailed a substantial financial outlay of public moneys and taxpayers have a profound right to know the value and result of that investment. However embarrassing or flattering the furnished study may prove to be to the park district administration, is not determinative or relevant. It is a public record.
b. Material Prepared for Litigation ?
The board argues that even if the roofing study is a public record, it is material prepared for litigation and therefore privileged from disclosure pursuant to CPLR 3101 (subd. [d]). In so contending, the board has the burden of proving that the data is exempt from inspection. (See Koump v. Smith, 25 N Y 2d 287.)
The court finds this argument interesting, but unpersuasive. First, there was no mention cf any ongoing or contemplated litigation in the board minutes when the study was authorized, *285 nor any mention thereof since; although the hoard did claim in argument that the study was undertaken on oral advice of counsel, no litigation has yet been commenced some 11 months afterwards.
Second, material collected in the “ ordinary course of business ” in governmental operations, “ including perhaps eventual use in any litigation which may ensue ”, as well might be a follow-up quality study of a major project about which adverse reports had been received, is not shielded from disclosure. (See Kandell v. Tocher, 22 A D 2d 513, 515; Finegold v. Lewis, 22 A D 2d 447; Weisgold v. Kiamesha Concord, 51 Misc 2d 456.)
Third, the shield from disclosure does not apply where it causes “ injustice or undue hardship ”. (CPLB 3101, subd. [d]; Seligson v. Fidelity & Cas. Co. of N. Y., 36 A D 2d 919, affd. 29 N Y 2d 825.) Denying inspection of the reports would in an electoral context result in injustice or hardship to the public and the candidate. This particular disclosure, perhaps otherwise elicitable in substance in a lawsuit, is uniquely important to a public dispute on the merits.
Fourth, it is doubtful whether that work product privilege appearing in the pretrial discovery section of the CPLB applies as against someone not an adverse party in litigation, seeking to inspect public records. If indeed a record is “public”, a definitive showing of need, to prevent its eventually reaching through public disclosure an adverse party in actual litigation, must be made before the documents may be secreted. There has been no such showing here as would outweigh the implicit public gain of 'governmental openness.
2. Park District Employee Information.
The names and pay scales of the park district employees, both temporary and permanent, are matters of public record and represent important fiscal as well as operational information. The identity of the employees and their salaries are vital statistics kept in the proper recordation of departmental functioning and are the primary sources of protection against employment favoritism. They are subject therefore to inspection.
The employees’ home addresses, however, do not carry the same prima facie public importance and unless a specific ‘ ‘ private ” need is shown for them, they need not be disclosed. (See, 15 Opns. St. Comp., 1959, p. 377.) In such instances, the strength of the competing consideration of employee privacy must be balanced against the margional benefit in the public’s knowledge of this specific information, such as protection against “ crony *286 ism ” or violations of local residence laws, and some cause should he shown to warrant their disclosure. (See Civil Service Law, § 23, subd. 4-a; Public Officers Law, § 3, .subd. 1; 47 N. Y. Jur., Public Officers and Employees, § 32.)
3. Commissioner Vouchers.
The board resists disclosing voucher records for salaries,
• expenses and time reported by each Commissioner. Yet, as this involves the allocation and expenditure of public funds, the public is vitally concerned with such information. Should an impropriety be unearthed, the public is the better for the gained awareness and is then in a position to take corrective action, either through political or judicial processes. Even without a showing or implication of wrongdoing or abuse, the board’s members may be compelled to allow inspection of their time and financial sheets. Since this information must be kept and filed in the ordinary course of business, its disclosure risks no offsetting harm.
No claim is made by the board that employment in the park district or financial data related thereto is, per se, classified or secret.
With respect to these items, as well as names of employees and pay scale, the board is only required to disclose records it keeps. It need not, on request, draw lists, summaries or make compilations, absent some showing of official bad faith, which does not appear in this case.
E. Summary.
That Dr. Winston is a local newspaper columnist and a present candidate for the board does not lessen the importance of the disclosure he seeks. Indeed, those added factors may heighten the need for open inspection, for public scrutiny of government operations is most effectively exercised and communicated by those with access to the media and public speaking podiums.
Accordingly, respondents are directed to allow Dr. Winston to inspect forthwith the complete laboratory study of the rink roof performed by the New York Testing Laboratories, Inc., the names and salaries of temporary and permanent park district employees, and the voucher data submitted by the Commissioners as to their expenses, time and salary. The request for the addresses of employees of the park district is denied, without prejudice to renewal upon a proper showing of need for that information.